**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

HEIDI NELSON,

Plaintiff,

v.

SHARON DICKE, individually and in her official capacity;
BRUCE JOHNSON, Meeker County Probation Officer, individually and in his official capacity; and
JOSEPH LENZ, Supervisor of the Meeker County Jail, individually and in his official capacity,

Defendants.

Civil No. 00-285 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Lawrence R. Altman, ALTMAN LAW OFFICE, 1660 Foshay Tower, 821 Marquette Avenue, Minneapolis, MN, 55402-2919; John Thomas Peterson, Cindi S. Matt, JOHNSON, LARSON & PETERSON, P.A., 908 Commercial Drive, Buffalo, Minnesota, 55313, for plaintiff.

James R. Andreen, ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Bloomington, MN, 55431, for defendants.

Plaintiff Heidi Nelson brings this action alleging a violation of her Fourth Amendment rights against unreasonable searches under 42 U.S.C. § 1983 and state law invasion of privacy. These claims arise out of a body cavity search performed on plaintiff while she was being admitted as an inmate to the Meeker County Jail.

MAR 3
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

Defendants have moved for summary judgment on the basis that their conduct did not violate plaintiff's Fourth Amendment rights and that they are entitled to qualified immunity. Defendants also claim that plaintiff's invasion of privacy claim fails as a matter of law. For the reasons that follow, the Court grants in part and denies in part defendants' motion.

## BACKGROUND

Because this matter is before the Court on a motion for summary judgment, the Court must review the facts in the light most favorable to plaintiff, the non-moving party. On December 19, 1997, plaintiff was arrested, charged, and booked with two controlled substance offenses.[1] Three days later, plaintiff was released pending trial on the condition that, among other things, she not use any mood altering substances, not possess any weapons and submit to random drug tests on a weekly basis. Plaintiff was assigned to Probation Officer Bruce Johnson ("Johnson"). Johnson has been a probation officer since 1972. Prior to that time, Johnson was a corrections officer and later a deputy sheriff in Kandiyohi County.

On December 30, 1997, plaintiff submitted to a urinalysis at Johnson's direction. The sample was reported as being over the maximum level recordable, which is 8,000 nanograms per milliliter ("ng/ml"). Consequently, Johnson filed an Apprehension and Detention Order on January 2, 1998, reporting that plaintiff had violated the court-

---

[1] Specifically, plaintiff was charged with Controlled Substance Crime in the Fifth Degree in violation of Minn. Stat. § 152.025 and with Conspiracy to Manufacture/Produce Controlled Substance in violation of Minn. § 152.096, subd. 1; § 609.175, subd. 2(3).

ordered conditions of her pretrial release by having an elevated amphetamine level on December 30, 1997. Plaintiff was arrested on January 4, 1998 and spent the next two days incarcerated at the Meeker County Jail. Upon being released on January 6, 1998, plaintiff provided another urine sample, which again came back as having an amphetamine level in excess of 8,000 ng/ml. On January 16, 1998, plaintiff provided another urinalysis with a similarly elevated methamphetamine level.

Sometime in the morning hours of January 23, 1998, Johnson determined that plaintiff should be arrested again for violating a condition of her release. Because Johnson suspected that plaintiff had been using methamphetamines in jail during her prior incarceration only a few weeks before, he determined that she should be subjected to a body cavity search. Plaintiff's high urinalysis taken in the Meeker County Jail on January 6, 1998 upon her release from a two-day incarceration indicated to him that she had been using drugs while in jail. He reasoned that her methamphetamine level could not be in excess of 8000 ng/ml if she had not been using narcotics in jail. Johnson based this conclusion on his training in law enforcement and from a conversation he had with an individual at RSI Laboratories who, according to Johnson, informed him that plaintiff's narcotic level should not be at the level it was after a two-day incarceration. Johnson also testified that plaintiff had indicated to him that he would not be able to keep her from using methamphetamines, although plaintiff denies making this statement.

Johnson then discussed the issue with Jail Supervisor Joe Lenz ("Lenz"). According to Lenz, Johnson told him that plaintiff had a number of high tests for methamphetamine, one such test having been taken upon her release from jail after being

incarcerated for two days; he was concerned that plaintiff was smuggling drugs into jail and using them while in jail; and that plaintiff had told him that he was never going to be able to stop her from using drugs no matter what he did. Lenz Depo. at 11. Based on this information, Lenz authorized a body cavity search to be performed on plaintiff. Lenz admits that he did not review the Meeker County Jail Policy on body cavity searches before authorizing the search[2] nor did he attempt to contact the county attorney or to get a warrant from a judge to perform the search on plaintiff. *Id.* at 14-15.

It was then decided that defendant Sharon Dicke ("Dicke"), a licensed practical nurse who works as a Victim Witness Coordinator for the County Attorney's Office, would perform the search.[3] In her experience as a nurse, she has performed these types of procedures throughout the years for a number of purposes, including removal of

---

[2] This policy provides:

> Never is a body cavity search allowed except by a professional medical staff person. A body cavity search must be documented as having probable cause to believe a problem exists. When searching a person be certain to examine all bandages, soles and toes of the feet, mouth, nose, hair, groin and ears. If any injury is found during the body search, describe the appearance and location of the injury.

Jail Policy 20-2, Exh. G.

[3] The facts conflict as to how Dicke came to be chosen to perform the search. According to Dicke, Lenz came up to her in the hallway and asked her if she would perform the body cavity search on Nelson. Lenz testified that Dicke overheard the conversation between himself and Johnson and volunteered to do the search.

foreign objects, examination and removal of tissue and excrement.[4] According to Dicke, Lenz directed her to perform a vaginal and rectal search on plaintiff.

In the early afternoon of that same day, plaintiff reported to the probation office for her weekly urinalysis test. As she was standing at the counter of the office, an officer approached plaintiff and placed her under arrest for violating a condition of her pretrial release by having an elevated urinalysis on January 6, 1998. The officer then escorted plaintiff to the booking room of the jail. Once there, she was met by Ruth Johnson,[5] who informed plaintiff that a body cavity search was going to be performed. Shortly thereafter, Dicke arrived and Dicke and Ruth Johnson discussed where the search would be performed. It was ultimately decided, by mutual agreement, to conduct the search in the inmate storage closet. This closet stores jail uniforms, personal property and jail toiletries.[6] Plaintiff described the closet as dusty, dirty and highly unsanitary. Another jailer, Charlot Rummel, claims the closet is unsanitary.

Once plaintiff was escorted into the closet, Dicke told plaintiff to strip down, put her foot up on a bucket and to spread her legs. Dicke then proceeded with a gloved finger to probe plaintiff's rectum, then plaintiff's vagina, followed by a second vaginal

---

[4] Although plaintiff emphasizes that Dicke had never before performed a body cavity search on a prison inmate, plaintiff does not present any evidence that a body cavity search in a prison setting is different from other contexts.

[5] Ruth Johnson is not a defendant in this lawsuit.

[6] Plaintiff claims the closet also stored coats, overalls and boots that prisoners wore when they worked in the local waste treatment plant, however, there is not much, if any, evidence in the record to support this claim.

search.[7] Plaintiff claims that Dicke did not change gloves between the rectal and vaginal search.[8] Plaintiff also claims that the way in which Dicke touched her during the search was not gentle and hurt plaintiff internally, causing cramping and clotting. Despite the jail policy requirement that body cavity searches be well documented, the only record of the search is contained in the jail log book, which states "Sharon Dicke down to do body cavity search." No contraband of any kind was found during the body cavity search.[9]

Plaintiff was released from jail on January 26, 1998. Shortly thereafter, plaintiff sought medical treatment from her doctor, reporting bleeding and pelvic pain from the search as well as a concern of infection due to the unsanitary conditions in which the search was conducted. A few months later, plaintiff was treated for depression, which plaintiff claims was caused in part because of the body cavity search.

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

---

[7] Although Dicke claims she performed the vaginal search first, followed by a rectal search, the Court must accept plaintiff's version of the facts for purposes of this motion.

[8] Again, although Dicke claims otherwise, plaintiff's facts are accepted as true for purposes of this motion.

[9] Ruth Johnson claims that she conducted a visual strip search of plaintiff afterwards in the bathroom as plaintiff changed into her prison uniform. Specifically, she claims she searched under plaintiff's arms and the bottom of her feet, ran her hands through plaintiff's hair and checked inside plaintiff's mouth for evidence of narcotics. R. Johnson Depo. at 59-60. Plaintiff denies that she was searched in any fashion other than the rectal and vaginal search conducted by Dicke. Nelson Depo. at 79-80.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir. 1981).

## II. 42 U.S.C. § 1983

Plaintiff's primary allegation in this action is that defendants violated her fourth amendment right against unreasonable searches when Johnson sought, Lenz authorized

and Dicke conducted a rectal and vaginal body cavity search of plaintiff. Defendants argue that summary judgment is appropriate because their actions did not violate the Fourth Amendment as a matter of law. Defendants also claim they are entitled to qualified immunity for their actions because their conduct was objectively reasonable under the circumstances and did not violate clearly established law.

As an initial matter, the Court finds that when all the facts are viewed in the light most favorable to plaintiff, there are at least material issues of fact which preclude granting summary judgment as to the substantive merits of plaintiff's Fourth Amendment claim. In the seminal case of *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court upheld a detention facility's policy of conducting visual body cavity inspections of pretrial detainees after contact visits with persons outside the prison. 441 U.S. at 560.[10] In concluding that the search policy was reasonable and could be conducted on less than probable cause, the Court stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559. In performing the balancing test set forth in *Wolfish* to the particular facts of this case, the Court finds that plaintiff has put forth sufficient evidence to support a

[10] The policy required a male inmate to lift his genitals and bend over to spread his buttocks for visual inspection. For female inmates, the vaginal and anal cavities were visually inspected. The inmate is not touched at any time during the visual search procedure. *Id.* at 558, n.39.

violation of her Fourth Amendment rights. The Court first considers the need to conduct the particular search. Defendants claim they had a particularized suspicion that plaintiff would smuggle narcotics into the jail given the high urinalysis results from her previous incarceration. While the need to conduct a search of plaintiff to prevent the introduction of narcotics into the jail may be a legitimate one, it must be balanced against the other factors set forth in *Wolfish*. Moreover, courts have held that "'[t]he more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted.'" *Jones v. Edwards, S.S.*, 770 F.2d 739, 741 (8th Cir. 1985) (quoting *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983)).

In this case, there is no question that plaintiff was subjected to the most intrusive form of body cavity search. Unlike in *Wolfish*, plaintiff was not subjected to merely a visual inspection of her body cavity. Rather, both plaintiff's rectum and vagina were manually and digitally probed, a total of three times.[11] Courts have consistently observed that strip searches are degrading, humiliating and embarrassing. *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (citing *Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir. 1994) ("One of the clearest forms of degradation in Western Society is to strip a person of his clothes."); *Romo v. Champion,* 46 F.3d 1013, 1019 (10th Cir. 1995); *Tinetti v.*

---

[11] The Court recognizes that courts have ruled upon the reasonableness of more intrusive searches such as the one at issue here. However, all these cases involved maximum security prisons and a documented history of violent inmates smuggling in drugs and weapons. *Terrovona v. Brown*, 783 F. Supp. 1281 (W.D. Wash. 1991); *Bruscino v. Carlson*, 654 F. Supp. 609 (S.D. Ill. 1987).

*Wittke,* 479 F. Supp. 486, 491 (E.D. Wis. 1979) (describing strip searches involving the visual inspection of the anal and genital areas as "'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission'") (quoting *Sala v. County of Suffolk* (E.D.N.Y. 1978) (unpublished opinion)), *aff'd,* 620 F.2d 160, 161 (7th Cir. 1980). Even the Supreme Court in *Wolfish* stated that "this practice [of visual inspections] instinctively gives us the most pause." 441 U.S. at 558; *see also* 441 U.S. at 594 (Stevens, J., dissenting) ("The body-cavity search—clearly the greatest personal indignity—may be the least justifiable measure of all [the security practices at the institution])."

The manner and location in which the search was conducted is equally troubling. According to plaintiff, Dicke inserted her finger into plaintiff's rectum and vagina in a rough manner. There is also no explanation in the record why plaintiff's vagina was probed twice, even though the first search revealed no contraband. Even more troubling is plaintiff's contention that Dicke did not change gloves between the vaginal and rectal searches. It is also significant that, according to plaintiff, only the vaginal and rectal areas were searched. A complete search for narcotics should have included a search of all areas in which narcotics could be hidden, including all the areas expressly listed in the jail policy. The search was also performed in a less than ideal condition—the inmate storage closet. The Court notes that there were no emergency-type circumstances that necessitated this search. *Cf. Schmerber v. California*, 384 U.S. 757, 770 (1966) (exigent

circumstances a factor in upholding body cavity search of plaintiff).[12] Rather, there were several hours between the time Lenz authorized the search and when plaintiff arrived at the jail. During that time, there was ample opportunity in which to not only consult the policy but also ensure that the search took place under the most sanitary conditions and in the most reasonable manner possible.

Thus, for all the foregoing reasons, the Court finds that plaintiff has set forth sufficient evidence that a Fourth Amendment violation occurred in this case. However, the Court must still address whether defendants are nonetheless immune under the doctrine of qualified immunity.

---

[12] In *Schmerber*, the Court upheld a blood sample taken from petitioner at a hospital following his arrest for driving an automobile while under the influence of intoxicating liquor. In concluding that the search and seizure was reasonable, the Court relied on the presence of exigent circumstances and also the fact that the search was performed in a reasonable manner. His blood was taken by a physician in a hospital setting according to accepted medical practices. *Id.* at 771. Although the Court upheld the validity of the search and seizure under the particularized facts of the case, the Court emphasized: "That we today told that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772. The Court further noted:

> We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment, for example, if it were administrated by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

*Id.* 771-72.

**A. Qualified Immunity**

"Under federal law, [governmental officials] have immunity against civil actions unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Myers v. Becker County*, 833 F. Supp. 1424, 1431 (D. Minn. 1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court is therefore to consider the "specific constitutional rights the defendants allegedly violated, whether the rights were clearly established in law at the time of the alleged violation, and whether a reasonable person in the official's position would have known that his conduct would violate such rights." *Waddell v. Forney*, 108 F.3d 889, 891 (8th Cir. 1997). The standard for qualified immunity is one of objective reasonableness. *Harlow*, 457 U.S. at 818. In evaluating whether an officer is entitled to qualified immunity, the Court must examine the information possessed by the police officer. *Myers,* 833 F. Supp. at 1431. Qualified immunity is a question of law to be decided by the district court. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

The first issue the Court must address is whether plaintiff has asserted a violation of a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232-33 (1991). If plaintiff does so, the Court's inquiry then proceeds to the question of whether the constitutional right in question is "clearly established" at the time of the alleged violation. *Id.* "For a right to be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While the "'defendants bear

the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority,' plaintiff must show that the law allegedly violated was clearly established." *Id.* (quoting *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992)).

As the Court has already indicated in the discussion above, plaintiff has asserted a specific constitutional violation in this case, claiming that defendants violated her Fourth Amendment rights by conducting an unjustified and unreasonable body cavity search of her. The Court also finds that the law was clearly established at the time the search was conducted. At the time of the search in January 1998, the Supreme Court and the Eighth Circuit had decided several cases concerning body cavity searches under the Fourth Amendment in the prison context. *Bell v. Wolfish,* 441 U.S. 520 (1979); *Goff v. Nix,* 803 F.2d 358 (8th Cir. 1986); *Franklin v. A. L. Lockhart*, 883 F.2d 654 (8th Cir. 1989); *Jones v. Edwards, S.S.*, 770 F.2d 739, 742 n.4 (8th Cir. 1985) (affirming district court's denial of qualified immunity for visual strip search of pretrial detainee).

In *Goff v. Nix,* the Eighth Circuit upheld a visual body cavity search policy similar to the policy at issue in *Wolfish*. *Id.* at 364.[13] Applying the balancing test set forth in *Wolfish*, the court concluded that the visual inspections do not violate the Fourth Amendment. The court first noted, as the Supreme Court did in *Wolfish*, that "weapons,

[13] The policy required visual body cavity searches whenever "an inmate enters or leaves the institution or the cellhouse if the inmate is in one of the segregation units, before and after contact visits or after exposure to general population inmates if the inmate is in a segregation unit, and any other time where there is a reasonable suspicion that an inmate is concealing contraband in a body cavity." *Id.* at 360.

drugs and other items of contraband are serious problems in our nation's prisons." *Id.* at 364. The case also presented greater security concerns than were present in *Wolfish*:

> Unlike the institution in *Wolfish*, ISP is a maximum security facility. The prisoners in this case are convicted felons instead of pre-trial detainees. The searches here apply in large part to inmates who are in segregation units because of their inability to conform to the prison rules. Moreover, the searches are not more intrusive or demeaning than those in *Wolfish*.

*Id.* at 365. On these facts, the court concluded that the prison had set forth substantial reasons to justify the search policy and that these concerns clearly outweighed the minimal additional intrusion of the inmates' personal rights. *Id.* at 366.

It does not escape the Court's attention that the above-cited cases all involved **visual** body cavity searches, a far less intrusive search than was involved here. However, a review of decisional law at the time of the search reveals that the law on more intrusive body cavity searches, particularly in the prison context, was also clearly established. *Daughtery v. Harris*, 476 F.2d 292 (10th Cir. 1973); *Terrovona v. Brown*, 783 F. Supp. 1281 (W.D. Wash. 1991); *Bruscino v. Carlson*, 654 F. Supp. 609 (S.D. Ill. 1987).

In *Daughtery*, the Tenth Circuit addressed whether a policy requiring rectal examinations during the transfer of prisoners to the United States Marshal's Office violated the inmate's rights of privacy and prohibition against unreasonable searches and seizures. 476 F.2d at 293-94. The court upheld the policy based on the fact that Leavenworth, the prison at issue, is a maximum security institution housing dangerous inmates and there was evidence of past incidents of inmates concealing contraband in the rectal cavity, some incidents resulting in injury to court officer. *Id.* at 294. The court

further noted that the searches were conducted in a reasonable manner "by trained professional medical assistants in a designated area and under sanitary conditions." *Id.* at 295.

In *Bruscino,* the district court reviewed the constitutionality of a rectal search policy of Control Unit inmates without reasonable suspicion following any contact with the outside public. 654 F. Supp. at 619. After noting that the law clearly permitted visual body cavity searches under similar circumstances, the court concluded that the more invasive physical search of inmates were permissible for the same reasons. *Id.* at 620. The court first noted that "the security concerns repeatedly noted in the various decisions are certainly present in Marion, the highest level maximum security prison in the federal penitentiary system." *Id.* Additionally, the record also indicated that inmates had used the rectal cavity to conceal contraband in the past. *Id.* As a result these two factors were sufficient to justify the rectal search policy in effect at the prison.

In *Terrovona*, inmates challenged the constitutionality of digital rectal probe searches. 783 F. Supp. at 1283. Plaintiff alleged that both the policy itself and the manner in which it was conducted were unconstitutional. *Id.* The search policy at issue provided for body cavity searches where there is reasonable suspicion that an offender is concealing contraband in or on his person prior to placement in an Intensive Management Unit or upon return to the Intensive Management Unit when a good opportunity for concealment has occurred. *Id.* at 1283-84. As in *Daughtery* and *Bruscino*, the Court upheld the policy on the basis that the prison houses extremely violent inmates, there was

a past history of drug smuggling and other less intrusive alternative searches such as a visual or x-ray exam were less effective than the rectal probe search. *Id.* at 1284-85.

It was also clearly established at the time of the search that the Fourth Amendment requires that body cavity searches of inmates be conducted in a reasonable manner. *Bonitz v. Fair*, 804 F.2d 164 (1st Cir. 1986) *rev'd on other grounds*, *Unwin v. Campbell*, 863 F.2d 124, 132 (1st Cir. 1988); *Terrovona*, 783 F. Supp. at 1286-87. In *Bonitz,* the First Circuit found that defendants were not entitled to qualified immunity where the searches of a group of female inmates suspected of drug violations, prostitution, and gambling "were conducted in the presence of male officers; police officers, not medical personnel, performed the searches; and each officer was provided with only one pair of gloves for the entire procedure." *Id.* at 169, 172. On these facts, the court concluded:

> In light of the then-prevailing case law from the Supreme Court, the courts of appeals, and the local district court, we find that a body-cavity search of female inmates conducted by police officers, involving touching, conducted in a non-hygienic manner and in the presence of male officers, was a clearly established violation of the inmates' fourth amendment right to be free from an unreasonable search.

*Id.*[14]

---

[14] In *Vaughan v. Ricketts*, 859 F.2d 736 (9th Cir. 1988), the Ninth Circuit also affirmed a district court's denial of qualified immunity where officers conducted searches of inmates in an open hallway on unsanitary tables, by medical assistants untrained in involuntary body cavity searches, and who did not wash their hands between searches. *Id.* at 741. The court concluded that "[n]o reasonable officer could believe that such searches were conducted in a reasonable manner, and so defendant was not entitled to qualified immunity on Vaughan's fourth amendment claim." *Id.* Although the jury later found in favor of defendants on qualified immunity grounds at trial, the Court noted that this finding was not precluded by its earlier decision since defendants presented evidence at trial rebutting plaintiffs' version of events. *Vaughan v. Ricketts,* 950 F.2d 1464, 1468-70 (9th Cir. 1991).

The above caselaw demonstrates that, at the time of the search, the law clearly established that body cavity searches, including physically intrusive ones like the one at issue here, are permissible provided they pass the test of reasonableness as set forth in *Wolfish* and its progeny and are conducted in a reasonable manner. Accordingly, the Court proceeds to the next question, which is, given this clearly established law, whether an objective officer standing in the shoes of defendants would have sought or conducted the search in question. Because plaintiff has sued three individual defendants, the Court analyzes this issue as to each individual defendant.

The Court concludes that Bruce Johnson is entitled to qualified immunity because an objective officer would have believed that requesting a body cavity search of plaintiff under the facts known at the time was constitutionally reasonable.[15] Looking at the facts Johnson possessed at the time he decided to seek authorization for a search of plaintiff, he had at least a reasonable suspicion that plaintiff had smuggled drugs into the Meeker County Jail during her prior incarceration and could do so again in the future. Plaintiff's urinalysis results on January 6, 2000, two days after she had been incarcerated, were over the maximum level recordable. Based on this information, Johnson's experience and training, and his contact with a source at RSI Laboratories, it was reasonable for Johnson to presume that plaintiff had smuggled drugs into jail during her incarceration on January 4, 1998.

---

[15] The Court focuses only on Johnson's decision to seek authorization to perform the search in determining whether his conduct was constitutionally reasonable because the record does not suggest that he was involved in any decision-making beyond this.

It is possible that the results of the urinalysis on January 6, 1998, were a result of drugs plaintiff ingested just prior to her arrest on the fourth of January. However, the Supreme Court has repeatedly emphasized that qualified immunity applies even though an officer makes a mistaken judgment so long as the mistaken belief was reasonable. *Cross v. City of Des Moines,* 965 F.2d 629, 631 (8th Cir. 1992) ("Qualified immunity gives '"ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law."'") (quoting *Hunter v. Bryant,* 502 U.S. 224, (1991) (quoting *Malley v. Briggs*, 475 U.S. 335 (1986))). In this case, even if Johnson mistakenly believed plaintiff had smuggled drugs into jail, his suspicions, based on the facts known to him at the time, were reasonable. The Court thus concludes that Johnson did not violate clearly established law in seeking authorization from Lenz that a body cavity search be performed.

The Court concludes, however, that neither Lenz nor Dicke are entitled to the same protection. As jail supervisor, Lenz authorized the search and presumably had the responsibility to ensure that the search was conducted in a reasonable manner. The record reveals that Lenz authorized the search based solely on what Johnson told him. He did not independently verify the elevated drug levels of plaintiff's urinalysis tests, nor did he review the jail policy manual outlining the procedures for conducting body cavity searches.[16] Lenz did find a medically trained person to conduct the search, however, he

[16] The Court recognizes that a violation of the jail policy does not necessarily amount to a constitutional violation. Nonetheless, Lenz's failure to consult or follow the policy is a factor in the Court's analysis in whether the search was conducted reasonably. Other courts have done the

(Footnote continued on next page.)

did nothing beyond this to ensure that the search was conducted in a reasonable manner. The record reveals that several hours passed between the time he authorized the search and when plaintiff arrived in the afternoon for her scheduled urinalysis. In this time, Lenz had ample opportunity to find an appropriate location in which to conduct the search under the most sanitary conditions possible and to consult the jail policy to ensure that the search was conducted in a reasonable manner.

Finally, the Court concludes that Dicke is not entitled to immunity based on the clearly established law that body cavity searches be conducted in a reasonable manner. At this stage in this case, the Court is required to view disputed facts in the light most favorable to the plaintiff. Plaintiff alleges that she was searched in an inmate storage closet which was not sanitary. According to the evidence presented by the plaintiff, the person conducting the search, although medically trained, probed plaintiff's vagina twice, her rectum once, performed the search in a rough manner and did not change gloves between searches. On these facts, the Court concludes that no reasonable officer could believe that such a search was conducted in a constitutionally reasonable manner. Accordingly, Dicke is not entitled to qualified immunity at this time.

---

(Footnote continued.)
same. *Bonitz v. Fair,* 804 F.2d 164, 169 (1st Cir. 1986) (noting that "[t]he officers did not follow prison instructions that required internal examinations of body cavities to be conducted by medical personnel in a hygienic and respectful manner").

## III. Invasion of Privacy

Plaintiff has also sued defendants for invasion of privacy. In *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231 (Minn. 1998), the Minnesota Supreme Court joined the majority of jurisdictions and recognized the common law tort claim of invasion of privacy. *Id.* at 235. Although the court recognized three versions of the claim, only one of the versions—intrusion upon seclusion—is implicated under the facts of this case. Intrusion on seclusion occurs when one "'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" *Id.* at 233 (quoting Restatement 2d of Torts § 652b (1977)). To prevail on this claim, plaintiff must show: "a) an intrusion; (b) that is highly offensive; and (c) into some matter in which a person has a legitimate expectation of privacy." *Swarthout v. Mutual Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001). Defendants claim that plaintiff's invasion of privacy claim fails because, as a pretrial detainee, she lacks a reasonable expectation of privacy to assert this claim. Defendants also maintain that they are entitled to official immunity.

Even assuming that plaintiff has presented sufficient evidence to support her state law tort claim, the Court concludes that official immunity applies. The official immunity doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Elwood v. Rice County,*

423 N.W.2d 671, 677 (Minn. 1976). In this case, there is no evidence in the record to suggest any of the defendants acted willfully or maliciously. Plaintiff's suggestion that Johnson singled her out for a body cavity search to "show her who is boss" is based on pure speculation.[17] There is also no evidence of record that either Lenz or Dicke acted willfully or maliciously. Plaintiff's invasion of privacy claim thus fails on immunity grounds.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 25] is **GRANTED in part and DENIED in part.**

---

[17] Plaintiff's testimony concerning Johnson's motives provides:

> Q: As you sit here today, do you know why Mr. Johnson ordered that search?
>
> A: Yeah.
>
> Q: Tell me why.
>
> A: Because he thought I was smuggling something into the jail.
>
> **Q: Is there any other reason that you know of for Mr. Johnson to do that search other than what you told me?**
>
> **A: I have speculations, but I don't know for a fact.**

Nelson Depo. at 81 (emphasis added).

a. With respect to plaintiff's claim under 42 U.S.C. § 1983 (Count I), defendants' motion is **GRANTED** as to defendant Bruce Johnson but **DENIED** as to defendants Joseph Lenz and Sharon Dicke.

b. The motion is **GRANTED** with respect to plaintiff's claim of invasion of privacy. Accordingly, Count II of plaintiff's complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE.**

DATED: March 31, 2002
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge